IN THE UNITED STATES DISTRICT COURT FOR THE
EASTERN DISTRICT OF VIRGINIA

Alexandria Division

| | | |
|---|---|---|
| FIDELITY GLOBAL BROKERAGE GROUP, INC., | ) ) ) | |
| Plaintiff, | ) ) | 1:10cv1255 |
| v. | ) ) | |
| RODNEY GRAY, | ) ) | |
| and | ) ) | |
| MORGAN STANLEY SMITH BARNEY, LLC, | ) ) ) | |
| Defendants. | ) | |

### **MEMORANDUM OPINION**

This matter is before the Court on Plaintiff Fidelity Global Brokerage Group, Inc.'s ("Plaintiff") Emergency Motion for Injunctive Relief and for an Order Compelling FINRA Arbitration. [Dkt. 3.] For the reasons stated below, the Court will grant the Motion.

### **I. Background**

Fidelity is seeking injunctive relief to prevent its former employee, Rodney Gray, from allegedly using its proprietary customer information to solicit Fidelity customers for his new employer, Morgan Stanley Smith Barney, LLC ("Morgan Stanley"). According to Fidelity's motion ("Mot."), during his

1

tenure as a Vice President/Senior Account Executive at Fidelity, Gray came into contact with hundreds of customer accounts. (Mot. at 1.) When he left for Morgan Stanley, he signed an Employee Agreement in which he promised to maintain the confidentiality of Fidelity's customer information, not to use Fidelity's trade secrets, and not to solicit Fidelity's customers for three years after termination of his employment. (Mot. Ex. B-2.)

Since leaving Fidelity on March 31, 1010, Gray allegedly used proprietary information to cause 12 Fidelity customers and over $9 million in assets to be transferred from Fidelity to Morgan Stanley. (Mot. at 1.) Several Fidelity customers have also complained to Fidelity that Gray is breaching their privacy by using their personal information to solicit them for Morgan Stanley. *Id.* Fidelity is pursuing these allegations through binding arbitration with the Financial Industry Regulatory Authority ("FINRA"), as required by FINRA Code of Arbitration Rule 13100 and 13200. (Mot. at 2.) While that arbitration is pending, Fidelity is requesting an injunction requiring Gray and Morgan Stanley to "immediately return all copies of Fidelity customer information," and "to stop using the information and to stop soliciting Fidelity customers in accordance with Gray's contractual obligations." *Id.*

## II. Analysis

Non-solicitation agreements are "form[s] of ancillary employee anti-competitive agreement[s] that [are] carefully scrutinized by the courts." *BDO Seidman v. Hirshberg*, 93 N.Y.2d 382, 388 (1999). The issuance or denial of a preliminary injunction or temporary restraining order "is committed to the sound discretion of the trial court." *Quince Orchard Valley Citizens Ass'n, Inc. v. Hodel*, 872 F.2d 75, 78 (4th Cir. 1989). "A plaintiff seeking a preliminary injunction must establish that he is likely to succeed on the merits, that he is likely to suffer irreparable harm in the absence of preliminary relief, that the balance of equities tips in his favor, and that an injunction is in the public interest." *Winter v. Natural Res. Def. Counsel*, 129 S. Ct. 365, 374 (2008).

A. <u>Likelihood of Success on the Merits</u>

Plaintiff cites an abundance of cases for the proposition that courts in the Eastern District of Virginia regularly grant injunctive relief pending FINRA arbitration, as well as a long list of cases in which Plaintiff itself has obtained injunctions to prevent former employees from soliciting its customers. (Mot at 14-15.) Plaintiff specifically argues that it is entitled to relief under (1) the Trade Secrets Act,

3

(2) Massachusetts contract law (for breach), and (3) tortious interference law.[1]

Regarding the Trade Secret Act claim, the Act permits injunctive relief to prevent "[a]ctual or threatened misappropriation" of trade secrets. Va. Code § 59.1-337. The Act defines a trade secret as information that "derives independent economic value . . . from not being generally known to . . . [or] ascertainable by proper means by, other persons." Va. Code § 59.1-336. The information at issue here, Fidelity's customer lists and customer information, easily qualifies.

Fidelity's customers' business is obtained at great expense, and, as shown in the instant matter, its customers are capable of taking their business elsewhere. Their status as Fidelity customers is not publically available, or at least not accessible without significant effort, and Fidelity apparently goes to lengths to ensure preservation of its secrecy. The information is therefore of value to whoever possesses it, and qualifies as a trade secret.

As to breach of contract, the Employee Agreement specifies that it is governed by Massachusetts law. (Mot. Ex. B-2, ¶ 12.) "Under Massachusetts law, a non-solicitation agreement, like an employee covenant not to compete, generally

---

[1] Plaintiff's argument as to tortious interference is limited to one sentence (see Mot. at 24), and, because this Court will find a likelihood of success on the merits of Plaintiff's two other claims, this Court will not address the tortious interference claim.

4

is enforceable only to the extent that it is necessary to protect the legitimate business interests of the employer." *Smith Barney Div. of Citigroup Global Markets Inc. v. Griffin*, No. 08-0022, 2008 WL 325269, at *6 (Mass. Supp. Jan. 23, 2008) (internal quotation marks and citation omitted). "Such legitimate business interests might include trade secrets, other confidential information, or . . . the good will the employer has acquired through dealings with his customers." *Id.* (internal quotation marks and citation omitted).

Again, the information at issue here easily falls into the category of "legitimate business interests" requiring protection. Indeed, Plaintiff cites four instances where this particular employee agreement was the basis for injunctive relief in Massachusetts courts, as well as nine cases nation-wide enjoining Fidelity employees from violating restrictive covenants in their employee agreements. (Mot. at 20.) Plaintiff moreover cites numerous injunctions used to prevent violations of non-*competition* agreements (more restrictive than non-*solicitation* clauses) in both Massachusetts and Virginia (Mot. at 20-21).

Defendant Gray's primary argument in opposition is that Gray's three-year non-solicitation period with Fidelity is unreasonably long and therefore unenforceable. In Massachusetts, non-competition or solicitation covenants are

generally held enforceable only to the extent necessary to protect the employer's legitimate business interests. *Marine Contractors Co. v. Hurley*, 365 Mass, 280, 287 (Mass. 1974). In Virginia, restrictive covenants are examined with regard to the legitimate interests of the employer, the employee, and the public at large. *Paramount Termite Control Co. v. Rector*, 238 Va. 171, 174 (1989). Under either rubric, there is a more than reasonable likelihood that the restrictive covenant at issue here will be upheld.

Gray cites no Virginia cases on this point, and relies on *Getman v. USI Holdings Corp.*, No. 05-3286, 2005 WL 2183159 (Mass. Super. Ct. Sept. 2, 2005), for the proposition that the three-year term here is unreasonable. *Getman* involved an insurance agent who was bound by a three-year non-competition agreement when he moved to a new insurance company. The case is inapposite for several reasons.

First, it involves a non-*competition* agreement, prohibiting Getman from even *competing* with his former employer, *id.* at *1, whereas the instant case involves a non-*solicitation* agreement only, which is far narrower.

Second, it describes at length how Getman, in his work for his former employer, personally earned--and therefore owned--much of his clients' goodwill. *Id.* at *3. The court stated: "To be sure, none of these clients were informed that, should

Getman leave [his company], they would be barred from continuing to do business with him at his new employ for three years." In the instant case, however, it appears that Gray is soliciting Fidelity clients whose information he gained access to, but whose goodwill he did little to foster. Indeed, a number of Fidelity clients appear undesirous of Gray's solicitations. (Mot. at 9-12.) In other words, under *Getman's* analysis, Fidelity, not Gray, appears entitled to the customers' goodwill.

Finally, and perhaps most inappositely, the Court in *Getman* did not invalidate altogether the ban on Getman's solicitation of former clients, it instead changed the term to a *one-year* ban. 2005 WL 2183159, at 4. Thus, because "[s]even months have passed since Gray left Fidelity" (Opp. at 5), the remedy in *Getman* would still result in Fidelity's success on the merits, at least in Massachusetts.

> B. Likelihood of Irreparable Harm without Immediate Relief

The likelihood of irreparable harm in customer solicitation cases such as this one is obvious. "Customers cannot be 'unsolicited,'" *Merrill Lynch v. Bradley*, 756 F.2d 1048, 1054 (4th Cir. 1985), and Plaintiffs' "loss of clients' goodwill and future business . . . [is] difficult, if not impossible, to measure fully," *IDS v. Sun America*, 958 F. Supp. 1258, 1281 (N.D. Ill. 1997). Also difficult to quantify is the

loss of customers' trust in the security of Fidelity as a custodian of their private information. *See Merrill Lynch v. Kramer*, 816 F. Supp. 1242, 1247 (N.D. Ohio 1992). These harms are all implicated by the facts alleged here. Plaintiff has provided numerous specific examples of allegedly improper solicitation in violation of Gray's employment agreement. (Mot. at 9-12.) Each is a potential example of lost business, lost goodwill, and lost trust--the amounts of which cannot be forecasted precisely.

It is true that Defendant Gray claims to have turned over all the client information he has in his possession. [*See* Dkt. 7, Ex. A., ¶ 6.] But Gray has not promised to stop soliciting business from persons he learned of while working at Fidelity. It is also true that Fidelity manages over $1.5 trillion in assets, meaning that any loss as a result of Gray's activities is dwarfed by Fidelity's overall size. But that harm may still be irreparable.

C. <u>Balance of Equities/Public Interest</u>

Under the facts alleged, the balance of equities tips heavily in favor of an injunction. Simply put, if it is true that Gray is contractually barred from using customer information he learned at Fidelity in his current position, then Gray loses nothing by an injunction prohibiting him from doing so. Likewise, if Morgan Stanley is not entitled to the fruits

of such efforts, then it too is not harmed by an injunction. Fidelity, on the other hand, argues that its "valuable trade secrets, goodwill, business reputation, methods of business operation, and contract rights," will suffer if an injunction is not granted. (Mot. at 26.) Moreover, "Public interest favors the protection of confidential business information and the enforcement of valid contracts." *ABT, Inc. v. Juszczyk*, No. 5:09cv119, 2010 WL 3156542, at *9 (W.D.N.C. Aug. 10, 2010). Therefore, considering the legitimate interests at stake, the balance of equities and the public interest both warrant an injunction here.

### III. Conclusion

Thus, for the reasons explained above, this Court will grant Plaintiff's motion.

|  | /s/ |
|---|---|
| November 9, 2010 | James C. Cacheris |
| 2:20 p.m. DST | UNITED STATES DISTRICT COURT JUDGE |
| Alexandria, Virginia | |